**Kurt A. PUTHE Jr., Plaintiff,**

**v.**

**EXXON SHIPPING COMPANY,
Defendant.**

**No. 89–CV–1619.**

United States District Court,
E.D. New York.

Sept. 26, 1992.

Hill, Betts & Nash, New York City (James M. Hazen, Susan P. Mahon, of counsel), for plaintiff.

Kirlin, Campbell & Keating, New York City (Cary R. Wiener, Todd L. Platek, of counsel), for defendant.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

Among the issues presented in this Jones Act case, is, the interesting and elusive question of whether a seaman can recover damages for purely emotional distress.

This is an action by the plaintiff Kurt Puthe, Jr. ("Puthe" or plaintiff), brought pursuant to the Jones Act, 46 U.S.C. § 688, claiming negligence and unseaworthiness on the part of the defendant Exxon Shipping Company ("Exxon" or defendant). The plaintiff asserts that he is a seamen with rights under the Jones Act and claims that he suffered various psychological and emotional injuries while serving on several of Exxon's ships.

Presently before the Court is the motion of the defendant for summary judgment pursuant to Federal Rule of Civil Procedure 56. Exxon contends that there is no basis for recovery for emotional injuries in the instant matter. Alternatively, Exxon maintains that the action is time-barred under Federal Employers' Liability Act, 45 U.S.C. § 56 ("FELA") and the Uniform Statute of Limitations for Maritime Torts, 46 U.S.C. § 763a ("USLMT"). The law developed under the FELA applies to Jones Act claims because it is incorporated by reference into the Jones Act (*see* 46 U.S.C. § 688: "Any seaman who shall suffer personal injury in the course of his employment [may maintain an action] and in such action all statutes of the United States modifying or extending the common-law right ... in cases of personal injury to railway employees shall apply").

For the reasons set forth below, the motion of the defendant is granted in its entirety.

### FACTUAL BACKGROUND

This action was commenced by complaint filed on May 29, 1989. According to the plaintiff, he was first diagnosed as having a psychiatric disorder on or about September 11, 1986. He maintains that, as a result of the diagnosis, he first learned of his injury at that time.

The defendant contends that the plaintiff's alleged psychological problems do not stem from the conduct of its employees or the unseaworthiness of its vessels. Exxon maintains that the plaintiff suffers from a personality disorder long predating his employment as a merchant seaman. Furthermore, Exxon contends that Puthe knew or had reason to know of his psychological problems as early as 1983. Therefore, Exxon contends that Puthe may not recover under the Jones Act or FELA. Alternatively, Exxon contends that Puthe's claims are time-barred under the applicable statute of limitations.

Though the factual background in this case is somewhat detailed, an examination of Puthe's personal and employment history is necessary to properly determine the defendant's motion.

The plaintiff was employed by the defendant as a merchant seaman aboard several of Exxon's ships between 1977 and 1986. While aboard several of these vessels, Puthe sustained certain physical injuries which are not the subject of this action. At issue here is Puthe's allegation that he suffered psychological injuries as a result of certain negligent acts committed by employees of Exxon. The allegedly negligent incidents range from the plaintiff being temporarily demoted to his being ordered to work under allegedly unsafe conditions. Puthe claims that these acts constitute the negligent infliction of emotional distress which caused him to experience depression. In particular, the plaintiff maintains that on or about August 22, 1986, as a member of the crew on board the Exxon Benecia, he suffered a stress reaction and has been unable to return to sea since that time.

*Puthe's Employment History*

Puthe joined Exxon in 1977, after having first obtained his "Z" card in 1976. He first sailed aboard the Exxon Chester and stopped sailing in 1986, with his last voyage aboard the Exxon Benecia. During his nine year career as a seamen with Exxon, Puthe made thirty-eight voyages on sixteen different vessels (Def.Ex. 2).

The plaintiff contends that he sustained numerous physical injuries as a seaman with Exxon. However, no legal action was ever brought against Exxon for such injuries. Puthe presents the following incidents in which he allegedly sustained physical injuries.

While aboard the Exxon Chester during 1977, he alleges that he was ordered to remove a scupper plug from the forward deck of the ship in bad weather, and was injured when hit by a wave. In 1978, aboard the Exxon Philadelphia, the plaintiff claims he fell on deck and injured his neck. In 1980, the plaintiff claims that he sprained his knee on board the Exxon Florence, but did not want to leave the ship so that he could be home in time for Christmas vacation. During a voyage in 1982, aboard the Exxon Chester, the plaintiff burned his hand while working in a pumping room. He suffered another burn while working aboard the Exxon Benecia in 1986. Puthe also claims the he sprained his foot on two occasions, once in 1984 and again in 1985.

As noted above, the plaintiff's alleged physical injuries are not directly implicated in this action. However, Puthe alleges that there were several other incidents that occurred on board Exxon vessels, which the plaintiff contends caused or contributed to his emotional injuries.

While the plaintiff was in the hospital recovering from his fall on board the Exxon Philadelphia in 1978, he learned that a crewmember of the Exxon New Orleans was killed working on the ship. After his release from the hospital, Puthe was assigned to the New Orleans. He walked off the ship the same day he signed on, claiming that he had a "bad feeling" about working on the ship and that he was "still a little schizie about falling in the first place on the Exxon Philadelphia" (Plt's Depo. p. 22–23).

The plaintiff also claims that in 1981 he lost a great deal of weight due to certain gastro-intestinal ailments. During that period of time, he was assigned to the Exxon Philadelphia under the command of Captain Marshall Price. According to Puthe, he was frightened by Price because he would order the ship's engines "throttled-up" in heavy seas. Puthe stated that he thought Price "wanted to take us to our grave with the ship" (Plt's Depo. p. 85). Price also allegedly required the men to work on deck in very cold weather and high winds.

While aboard the Exxon Chester in 1982, Puthe had a confrontation with Second Officer Thomas Rice. Puthe refused an order to work in an overheated pump room. According to the plaintiff, Rice allegedly shoved or poked him and threatened to "kick his ass" if he failed to obey the order (Plt's Depo. p. 31). Puthe carried out the order, but burned his hand in the process. Afterward, he had a further confrontation with Rice at which time Rice repeated his threat.

In 1983, while serving under Captain Witty on the Exxon Bangor, the plaintiff learned that a ship named the Marine Elec-

tric was sinking in a winter storm approximately five nautical miles from the Bangor. Captain Witty sent a distress signal, but it was too late; the Marine Electric sank, causing the death of twenty-eight seamen. The plaintiff alleges that this incident caused him great emotional upset (Plt's Depo. p. 86–87).

Puthe also avers that on several occasions he was exposed to harmful chemicals. He alleges that he developed chloracne in 1982 due to his exposure to caustic soda which contaminated the water supply on board the Exxon Huntington. In 1986, he claims that he was exposed to harmful gasses while working in tanks on the Exxon Houston. He further alleges that he was continually exposed to asbestos, fiberglass and hydrocarbons while on Exxon ships.

Periodically, throughout his career, Puthe asserts that he was improperly "bumped," that is, temporarily demoted from his duties as an "able-bodied seaman" to those of an "ordinary seaman." He alleges this twice occurred in 1984 aboard the Exxon Newark and the Exxon North Slope. In 1985, while aboard the Exxon Lexington, Captain John Mazza bumped Puthe from oiler to utility man due to personnel restrictions. Puthe complained and threatened to walk off the ship but Mazza insisted that he accept the temporary demotion to utility man. Upon determining that Mazza was resolute, instead of leaving the ship as he threatened, Puthe returned to his room and suffered an emotional breakdown. Puthe stated in his deposition "I went to my room and cried hysterically for an hour. I first realized at that point I am not in control of my life or my emotions and that I had a problem ...". (Plt's Depo. p. 27). Puthe later noted that Mazza was the "one officer that made me realize I had a mental problem. I was unable to cope and I was in a bad position.... The stress was too great to handle at the time" (Plt's Depo. p. 84).

*Puthe's Psychiatric Treatment*

Puthe maintains that the foregoing incidents occurred through the defendant's negligence and unseaworthiness of its vessels. He further contends that such incidents caused him emotional distress, but that he only became aware that his emotional problems were related to his employment with Exxon in August, 1986.

It appears that sometime in the summer of 1986 Puthe began feeling extremely depressed. However, Puthe continued to sail, signing on for the Exxon Benecia on July 31, 1986 and signing off on August 27, 1986. This was the plaintiff's last voyage. Although it is unclear, Puthe alleges that some incident occurred while on board the Benecia that prompted him to seek psychiatric care.

During 1986, he sustained bouts of fatigue and depression and sometime in late August, Puthe visited Dr. Schwartz, his personal physician. Dr. Schwartz prescribed an antidepressant medication known as Tofranil. According to the plaintiff, the medication had no beneficial effect. In or about late August or early September, 1986, Puthe sought further treatment for his condition, visiting Becky Rizzo, an Exxon employment assistance counselor. Rizzo referred the plaintiff to Dr. Marguerite G. Larsen. Puthe alleges that during this period he was so depressed and so lacking in self-esteem, he began playing russian roulette with loaded guns (Plt's Depo. p. 67). In this regard, he stated "I put my destiny or fate in the hands of Jesus Christ or God and I figured if it was time to go, it was time to go. When it wasn't time I thought it was even funnier. I thought it was funnier and I could do it again" (Plt's Depo. p. 68).

On September 11, 1986 Puthe visited Dr. Larson. In the course of that visit Puthe intimated that he had difficulty breathing and sleeping, suffered weight loss and had experienced other ailments similar to those suffered in 1981 while aboard the Exxon Philadelphia. He also told Dr. Larson he had entertained thoughts of suicide. She prescribed antidepressant medication and suggested continued treatment. Puthe did continue to visit Dr. Larson for treatment, who made a diagnosis of depression. After a session on September 18, 1987, Dr. Larson noted that Puthe "often relates feeling

abused by others" (Plt's Ex. 3). At that time she confirmed that Puthe was suffering from depression, but attributed to it no cause.

Puthe continued treatment with Dr. Larson through March 22, 1989. She noted that drug therapy was no longer required. Her final medical report and diagnosis indicated that Puthe suffered from dysthymia with his work as a stress factor (Plt's Ex. 1).

On or about March 4, 1987 Puthe saw Dr. Roy Carmen, a gastro-intestinal specialist, in regard to his weight loss and rectal bleeding. In a letter dated March 4, 1987 addressed to Dr. Larson, Dr. Carmen noted that Puthe expressed that he was depressed and anxious about his life style and job in the Merchant Marine. Puthe said he feared the potential long term effects of being exposed to noxious cargos while at sea. Dr. Carmen diagnosed his illness as a probable spastic bowel and hemorrhoid disease. He suggested that his illness may be related to an "underlying functional and psychological complaint" (Plt's Ex. 5).

While Puthe was under the psychiatric care of Dr. Larson he was also under consideration for termination of his employment by Exxon. On or about April 9, 1987, Exxon physician Dr. Wren Nealy examined Puthe and determined that the plaintiff was "disabled" and should be restricted to shore duty. Dr. Nealy further determined that Puthe should not be placed in "any significantly stressful job" (Plt's Ex. 1).

On September 12, 1989, at the behest of his lawyer, Puthe visited Dr. Lawrence L. Kaplan, a psychiatrist. By letter dated October 19, 1989 Kaplan reported his findings and opinion in connection with the examination. Dr. Kaplan reviewed much of Puthe's personal and employment history. He noted that in August of 1986, during the period Puthe was seeking treatment from Dr. Schwartz, his girlfriend ended their relationship. Puthe explained to Kaplan that he became so depressed that he wanted to assassinate the President of Exxon for what he supposedly did to Puthe and other crew members. Referring to the contemplated assassination of Exxon's President, Puthe stated he "really considered blowing his head off" (Plt's Depo. p. 67).

Approximately one year later, in September of 1987, while receiving disability payments from Exxon, Puthe moved to Lake Tahoe, Nevada and met a new girlfriend. She became pregnant and the couple moved to California, his girlfriend worked and he took care of the child. However, in or about July of 1989 his girlfriend left him, taking their child. Puthe claimed that she left him because he was "a miserable person," who made her very unhappy. As of October, 1989 Puthe stated that he was depressed over the absence of his 16 month old son and the fact that the mother of his son had a new boyfriend.

From this series of disjointed events, Dr. Kaplan concluded that Puthe's symptoms were consistent with "an adjustment disorder with an episode of major depression, precipitated by [his] experience at Exxon ..." (Plt's Ex. 4). Neither Doctors Kaplan nor Larson attributed the plaintiff's depression to a particular event or incident. It appears they concluded, however, that Puthe's condition was generally related to his employment with Exxon.

On February 28, 1991 the plaintiff was examined by psychiatrist Dr. Mortimer F. Shapiro, on behalf of the defendant. Dr. Shapiro also reviewed the reports of Dr. Kaplan and Dr. Larson, Puthe's deposition taken on January 17, 1990 together with other material regarding the plaintiff's personal and employment history. Dr. Shapiro concluded that it was unlikely that he suffered from an "adjustment disorder" or a single depressive episode. Rather, Dr. Shapiro characterized Puthe's personality disorder as classic "Passive Aggressive Personality Disorder, 301.84" (Def's Ex 5). Further, Dr. Shapiro characterized Puthe's condition as a "built-in" personality disorder and expressed doubt as to how such a disorder could be causally linked to the events alleged to have occurred during his employment with Exxon. In support of this conclusion, Dr. Shapiro noted that by his own description Puthe was an angry person, including anger at his perceived

mistreatment at the hands of Exxon. In fact, according to Shapiro's report, Puthe attributed his suicidal tendencies to "stingy economic practices of Exxon" and stated that Exxon "destroyed my career" (Def's Ex. 5).

## DISCUSSION

Initially, it is noted that, contrary to the defendant's suggestion, this Court is not bound to apply the law of the Court of Appeals for the Third Circuit. The defendant maintains that because the plaintiff has the greatest contacts with the state of New Jersey, under New York state choice of law analysis, this Court's decision should be controlled by Third Circuit precedent.

The defendant appears to have confused the application of conflict of law principles in the federal system. A choice of law analysis under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny is incumbent upon a district court sitting in diversity jurisdiction. However, when jurisdiction is premised upon a federal question, such choice of law analysis is inapplicable (*see* C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* § 4501 [1991]). Therefore, while the Court must and will consider caselaw within the Third Circuit, the Court declines to limit its analysis to the law of that Circuit.

### 1. *Summary Judgment Standard.*

Summary judgment shall be granted in favor of a party if it is demonstrated that there are no genuine issues of material fact for trial, and that the movant is entitled to judgment as a matter of law (*see* Fed. R.Civ.P. 56[c]; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 [1986]). The Court must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion (*see Liscio v. Warren,* 901 F.2d 274, 276 [2d Cir.1990]; *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 [2d Cir.1986], *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 [1987]). Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists (*see National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 203 [2d Cir.1989]). However, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment (*see Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 [2d Cir.1990]).

### 2. *Negligent Infliction of Emotional Distress under the Jones Act and FELA.*

Since the FELA is incorporated by reference in the Jones Act, the analysis of the plaintiff's claims is guided by the law developed under the FELA as well as the Jones Act (*see Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 [1960]).

▪ The issue in this case is whether the Jones Act or the FELA provides a cause of action to a Jones Act seaman based solely upon emotional injuries allegedly suffered by the seaman as a result of his employer's negligent conduct.

In *Atchison, Topeka & Santa Fe Railway v. Buell,* 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987), speaking through Justice Stevens, a unanimous Supreme Court stated that:

> "the question whether 'emotional injury' is cognizable under the FELA is not necessarily an abstract point of law or a pure question of statutory construction that might be answerable without exacting scrutiny of the facts of the case.... [W]hether one can recover for emotional injury might rest on a variety of subtle and intricate distinctions related to the nature of the injury and character of the tortious activity" (*Buell, supra,* 480 U.S. at p. 569, 107 S.Ct. at p. 1417).

While suggesting that such a cause of action may be viable, the Court made clear that the states "vary in degree of intent required to establish liability, and the level of physical manifestation of the emotional injury required to support recovery" (*Buell, supra,* 480 U.S. at p. 569, 107 S.Ct. at p. 1417). The Court appeared to have indicated that some minimum standards, based on common law developments in the

area of emotional torts, would be required to support such an action. Justice Stevens observed that employees seeking recovery must suffer a "severe emotional injury" occasioned by "unconscionable abuse which is a prerequisite to recovery" (*Buell, supra,* 480 U.S. at p. 566 n. 13, 107 S.Ct. at p. 1416 n. 13). Therefore, while suggesting that emotional injuries may be cognizable. under FELA, the Court tempered this fact by noting that "it is a mistake to assume that a significant percentage of employees bringing grievances suffer the same type of severe emotional injury that has generally been required to establish liability for purely emotional injuries ..." (*id.*).

Accordingly, under the *Buell* standard, the Court must determine whether the nature and extent of the plaintiff's injury is "severe," and whether such injury was caused by the defendant's "unconscionable abuse." However, the Court must bear in mind that the Supreme Court has also held that the causal link necessary to establish liability under FELA is satisfied if the employer's negligence "played any part, even the slightest, in producing the injury or death for which damages are sought" (*Rogers v. Missouri Pacific R.R.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957).

### a. *The Circuit Courts and Buell*

The Circuit Courts have construed *Buell* as an invitation to explore the possibility of recovery under FELA for solely an emotional injury (*see Moody v. Maine Cent. R. Co.,* 823 F.2d 693, 694 [1st Cir.1987]). In a leading case accepting this invitation and recognizing the possibility of recovery under FELA for purely emotional injury, the Fifth Circuit in *Plaisance v. Texaco, Inc.,* 937 F.2d 1004, 1009 (5th Cir.1991) held that "a claim for an emotional injury caused by emotional distress negligently inflicted, even without an accompanying physical injury or contact, is cognizable under the FELA."

In arriving at its conclusion, the *Plaisance* Court noted that a number of Circuit Courts have either avoided addressing the issue of whether a claim based on emotional injury alone is cognizable under FELA

or declined to recognize such a cause of action. For example, the First Circuit declined to decide whether under FELA a plaintiff could recover for emotional injuries unaccompanied by physical injuries (*see Moody, supra*). Similarly, in *Holliday v. Consolidated Rail Corp.,* 914 F.2d 421 (3d Cir.1990) *cert. denied* — U.S. —, 111 S.Ct. 970, 112 L.Ed.2d 1057 (1991), the Third Circuit left open this question in upholding summary judgment in favor of the defendant. Following *Buell,* the *Holliday* Court made a fact specific finding that the character of the defendant's conduct and the nature of the injury did not constitute a compensable injury under FELA (*see Holliday,. supra,* at p. 425).

In limiting FELA actions, the Seventh Circuit stated that the Act does not countenance suits for tortious harms brought about without some physical contact or the threat of physical contact (*see Gillman v. Burlington Northern R.R.,* 878 F.2d 1020 [7th Cir.1989]; *Hammond v. Terminal R. Ass'n,* 848 F.2d 95 [7th Cir.1988] *cert. denied,* 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 229 [1989]).

The Sixth Circuit also limited FELA actions by holding that a claim for *intentional* infliction of emotional distress is not actionable under FELA (*see Adkins v. Seaboard Sys. R.R.,* 821 F.2d 340 [6th Cir.] *cert. denied,* 484 U.S. 963, 108 S.Ct. 452, 98 L.Ed.2d 392 [1987], but left open the question whether an action for *negligent* infliction of emotional distress may be brought under FELA (*Adams v. CSX Trans., Inc.,* 899 F.2d 536 [6th Cir.1990]).

### b. *The "New Rubric" under Plaisance*

Notwithstanding the apparent reluctance of the Circuit Courts to include the tort of intentional or negligent infliction of emotional distress under FELA, the Fifth Circuit, over the dissent of Judge Jones, did approve such a cause of action. However, it did so by creating "a new rubric" under which to analyze each case (*see Plaisance, supra,* at p. 1009).

In *Plaisance,* the Court rejected the "physical impact" rule, which would limit claims for emotional injuries to those situa-

tions including some physical contact. The Court also disavowed the "zone of danger" doctrine, which permits recovery for the witnessing of some harm only if the plaintiff was also physically placed in danger by that harm. Although the Court accepted the general rule that some physical injury is a necessary accompaniment to a claim for psychological injuries as an authentication of an actual emotional injury, it dismissed such rules as arbitrary in their application (*see Plaisance, supra,* at p. 1010–11).

Instead the Court applied a "full recovery" rule based on an objective standard. This test requires that the "plaintiff's claimed emotional injury must result from a situation in which a reasonable person, normally constituted, would not be able to cope adequately with the mental distress occasioned by the circumstance" (*Plaisance, supra,* at p. 1010). A "normally constituted" seaman-plaintiff would not include "those persons of such a fragile or delicate psyche that their resistance to emotional stress falls below that expected of a similarly situated seaman" (*Plaisance, supra,* at p. 1010 n. 7). Therefore, in order to recover under this *Plaisance* rule, the plaintiff's experience must be measured against that of a hypothetical "reasonable seaman" similarly situated to the plaintiff.

c. *The En Banc Rehearing of Plaisance*

On July 14, 1992 the Fifth Circuit, by an *en banc* panel, reheard the *Plaisance* case to consider whether the facts at issue were appropriate for the Court to establish a rule of recovery for purely emotional injuries under the Jones Act (*see Plaisance v. Texaco, Inc.,* 966 F.2d 166 [5th Cir.1992] [*en banc*]).

In *Plaisance,* the plaintiff, a tugboat captain sustained "posttraumatic stress disorder" as a result of alleged negligence which caused the spud of a towed barge to rupture an underwater gas pipeline, causing an explosion, starting a fire, and requiring the captain of the tugboat to rescue the crews from the barge and another nearby tugboat. The fire was extinguished and the rescue was successful, with no one, including the plaintiff, physically injured by the incident. The plaintiff was not involved in fighting the fire and his tugboat was not harmed by the explosion or rescue. Later that day, the plaintiff went to the hospital where he was treated for several days. He subsequently was transferred to a psychiatric hospital where he received extended care. Eventually, he was diagnosed by a psychiatrist as suffering from posttraumatic stress disorder and has been unable to return to work since then.

The *en banc* panel affirmed the District Court and the original Circuit panel in holding that under any theory of recovery, no damages could be had for the plaintiff's purely emotional injuries (*Plaisance, supra,* at p. 168). However, Court took the opportunity to consider whether the it was appropriate for the original Circuit panel to adopt a "full recovery rule," which had the effect of henceforth recognizing claims for purely emotional injuries.

The *en banc* panel concluded that the facts of the case did not allow the Court to permit recovery of damages for such purely emotional injuries. The Court disavowed its previous holding and instead reaffirmed its decision in *Gaston v. Flowers Transp.,* 866 F.2d 816 (5th Cir.1989). In *Gaston,* the Fifth Circuit denied recovery to a plaintiff for purely emotional injuries resulting from a tortious act directed at a third person.

Recognizing the problems of adopting broad rules of recovery in emotional tort cases, the *en banc panel* of the *Plaisance* Court noted that "[o]ther circuit courts have similarly resisted adopting a general rule of recovery for purely emotional injuries in cases where the plaintiff has failed to present a prima facie case" (*Plaisance, supra,* at p. 169). As an example, the Court cited to the Third Circuit opinion in *Outten v. National R.R. Passenger Corp.,* 928 F.2d 74 (3d Cir.1991).

d. *The Third Circuit*

While the Fifth Circuit has considered expanding the rights of Jones Act and FELA plaintiffs, the Third Circuit has declined to do so. In *Outten,* the Court held

that no recovery could be had for claims based on purely emotional injuries arising out of the plaintiff's reasonable belief that he was placed in danger of physical injury (*see Outten, supra,* at p. 79). In *Outten,* the plaintiff sought damages for emotional injuries caused by a train collision which occurred more than a mile away from the plaintiff, but which the plaintiff thought, albeit incorrectly, would occur close to him. Noting that claims for the negligent infliction of emotional distress must be determined on an *ad hoc* basis, the Court reiterated "the policy reasons for applying a cautious approach before enlarging recovery under the FELA to encompass damages for stress-related illnesses arising out of stressful positions" (*Outten, supra,* at p. 77). The Court cited the need to prevent fraudulent claims, incalculable and potentially unlimited damages and a flood of litigation by disenchanted workers (*see Outten, supra,* at p. 77; *see also* Restatement [Second] of Torts § 46).

In another FELA action, the Third Circuit, following the Supreme Court's analysis in *Buell,* held that the plaintiff's job-related stress did not constitute an "injury" within the meaning of FELA, where the plaintiff has suffered no physical injury other than symptoms related to job pressures (*see Holliday, supra,* at p. 422). In *Holliday,* the plaintiff maintained that such pressures were caused by being forced to work in the position of train conductor though he was not qualified for the job. While the plaintiff's symptoms included nightmares, sleeping disorders, spastic colon, anxiety and depression, the Court determined that the physical manifestations of stress did not constitute a compensable injury under FELA (*id.* at p. 425). Drawing on an opinion by Judge Posner, the Court explained that simply because a job is too difficult for an individual to perform does not make that job situation actionable (*Holliday, supra,* at p. 424 *quoting Lancaster v. Norfolk and Western Ry. Co.,* 773 F.2d 807, 813 [7th Cir.1985] *cert. denied* 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 [1987] [recovery may not be had solely due to " 'too much—not too dangerous—work' "]).

### e. *The Second Circuit*

Though the Second Circuit has not expressly ruled on the issue before the Court, several district courts within the Circuit have addressed similar situations in FELA cases.

In *Visconti v. Consolidated Rail Corp.,* 801 F.Supp. 1200, the Court granted the defendant's motion for summary judgment, dismissing the plaintiff's claim for the negligent and intentional infliction of emotional distress. The plaintiff's claim was based on 54 separate incidents of harassment at the hands of her managers and supervisors. Such incidents included acts of intimidation, demotions, denials of job requests and harassing telephone calls.

The *Visconti* Court analyzed the facts against *Buell* and determined that the conduct described by the plaintiff did not constitute "unconscionable abuse." In fact, the Court noted that most of the plaintiff's complaints stemmed from conditions of her employment such as her jobs, rates of pay and other matters covered under a collective bargaining agreement. Following the *Buell* Court's suggestion that the district courts look to state common law for guidance on the "unconscionable abuse" element of the plaintiff's claim, the *Visconti* Court referred to the New York State Court of Appeals decision in *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). Under *Murphy,* to prevail at common law, the plaintiff must show that the defendant's conduct was " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community' " (*Murphy, supra,* at p. 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 [*quoting* Restatement [Second] of Torts § 46]).

In concluding that the plaintiff failed to establish her claim, the Court stated that courts should not

"define the 'unconscionable abuse' element of emotional distress so as to in-

clude normal disputes over wages, hours and positions ..." (*Visconti, supra,* at 1211). "Disgruntled employees cannot transform such disputes into tort actions simply because they are dissatisfied with the results of the appropriate procedures" (*id.*). "To cast an employer into liability based on such conduct would be to undermine the unconscionable abuse standard which is designed specifically to prevent the tort of emotional distress from becoming the weapon of every disgruntled employee" (*id.* at 1212).

The Eastern District employed a strict interpretation of the "unconscionable abuse" element in *Feldleit v. Long Island R.R.,* 723 F.Supp. 892 (E.D.N.Y.1989), where Judge Weinstein, following Justice Stevens opinion in *Buell,* dismissed a FELA case based on the plaintiff's distress over his suspension and demotion arising out of his employer's accusations of insubordination and sexual harassment. The Court stated that "there [had] been no showing of negligence [and] there [was] no basis to conclude that plaintiff was subject to *the type of unconscionable abuse which is prerequisite to recovery for purely emotional injury*" (*Feldleit, supra,* at p. 901 [emphasis supplied]).

Recognizing the tort of the infliction of emotional distress in the context of a labor union's breach of its statutory duty of fair representation, the Second Circuit noted that the "general rule in tort law is that, absent injury, a plaintiff may recover damages for emotional distress only if the defendant has engaged in 'extreme and outrageous conduct intentionally or recklessly caus[ing]' that distress" (*Baskin v. Hawley,* 807 F.2d 1120, 1133 [2d Cir.1986]; *see also Cohen v. Metro–North Commuter R.R.,* 1991 WL 4699, 1991 U.S.Dist.LEXIS 317 [S.D.N.Y. January 11, 1991).

In two Southern District cases, it was held that a FELA plaintiff may bring an action for the negligent infliction of emotional distress, provided that there has also been some physical manifestation. In *Masiello v. Metro–North Commuter R.R.,* 748 F.Supp. 199 (S.D.N.Y.1990), the plaintiff's ulcer satisfied the injury requirement. In *Halko v. New Jersey Transit Rail Operations, Inc.,* 677 F.Supp. 135 (S.D.N.Y.1987), the plaintiff's suicide was considered a showing sufficient to meet the physical manifestation requirement.

In the wake of the Supreme Court's decision in *Buell,* the Circuit Courts are divided as to whether FELA supports a cause of action for the infliction of emotional distress. For example, the Ninth Circuit has continued to permit recovery for purely emotional injuries under FELA, adhering to its decision in *Buell v. Atchison, Topeka & Santa Fe Ry,* 771 F.2d 1320 (9th Cir. 1985), which was affirmed in part and reversed in part by the Supreme Court on different grounds. In contrast, the Third Circuit in *Outten* limits such recoveries. Therefore, the parameters of a claim for the negligent infliction of solely emotional distress are unsettled. However, *assuming arguendo,* that there is such a cause of action recognized in the Second Circuit, the plaintiff must demonstrate that the defendant's actions amounted to an "unconscionable abuse" of the plaintiff, causing "severe emotional distress" resulting in some physical manifestation of the harm (*see Masiello, supra; Feldleit, supra*).

While the plaintiff in this case has endured many hardships in his career as a seaman, it is clear that he has not demonstrated any legally cognizable separate definable acts of negligence on the part of the defendant. It appears that notwithstanding the plaintiff's love of life on the sea, he was not suited for the rigorous demands of such a life. This is borne out by the plaintiff's many comments concerning his depression as related to his *lifestyle* as a merchant seaman (*see e.g.,* Letter of Dr. Carmen, Plt's Ex. 5).

Moreover, the plaintiff has not established any specific acts or conduct, either alone or in the aggregate, which constitute the "unconscionable abuse" which would support a cause of action under the plaintiff's theory of recovery (*see Buell, supra,* 480 U.S. at p. 566 n. 13, 107 S.Ct. at p. 1416 n. 13; *Feldleit, supra,* at p. 901). Although the plaintiff may have engaged in heated arguments with other crewmem-

bers, such disputes cannot be fairly characterized as "negligent" conduct, no less unconscionable abuse. Further, the plaintiff's altercation with Second Officer Tom Rice, in which Rice physically touched Puthe, does not rise to level of abuse or neglect legally sufficient to sustain such a cause of action. Such conduct pales in comparison with the common law standard of unconscionable abuse (*see Murphy, supra,* 58 N.Y.2d at p. 303, 461 N.Y.S.2d 232, 448 N.E.2d 86; *see also Kraus v. Consolidated Rail Corp,* 723 F.Supp. 1073 [E.D.Pa.1989]). In regard to the series of physical injuries alleged by the plaintiff, it appears that while Puthe may have been made fearful by his experience as a seaman, such feelings were not caused by any negligent acts of the defendant.

Therefore, while Puthe has raised many "facts" with regard to his experiences at sea, the plaintiff has failed to raise a triable issue of *material fact* precluding the granting of summary judgment. In accordance with *Buell,* when measured against the common law standards which have been applied by the Courts of the Second Circuit, the plaintiff was not subject to the "type of abuse which is prerequisite to recovery for purely emotional injury" (*Feldleit,* 723 F.Supp. at p. 901), as a matter of law.

Furthermore, even considering the minimal causation requirement in FELA cases (*see Rogers, supra,* 352 U.S. at p. 506, 77 S.Ct. at p. 448), the plaintiff cannot, as a matter of law, establish that any negligent conduct on the part of the defendant was a cause of his emotional distress. Under any causal doctrine, Puthe has failed to establish a triable issue of material fact as to how the alleged negligent conduct of the defendant resulted in the plaintiff's mental distress.

At this juncture, it is useful to reiterate the policy reasons enunciated by the Third Circuit which militate in favor of cautiously approaching potentially unlimited rules of recovery. In this Court's view, we must be careful in expanding recovery under the Jones Act or FELA to include damages for "stress-related illnesses arising out of stressful positions" without underlying physical injury (*Outten, supra,* at p. 77). As noted by the *Outten* Court, consideration of such purely emotional damage claims should be guided by the "need to prevent (1) fraudulent claims; (2) incalculable and potentially unlimited damages; and (3) a flood of litigation brought by disenchanted workers" (*id.*).

It is precisely these problems that the plaintiff in the instant case asks the Court to undertake, so that he may recover for his alleged injuries. This Court declines to do so.

### *Statute of Limitations under FELA and USLMT*

Finally, the Court will now consider the defendant's assertion that the statute of limitations bars this action. Under the FELA, an action must be brought within three years of the date the cause of action accrued (*see* 45 U.S.C. § 56). This section is also applicable to Jones Act seaman (*see Engel v. Davenport,* 271 U.S. 33, 38–39, 46 S.Ct. 410, 412–13, 70 L.Ed. 813 [1926]).

██ In the case of an alleged injury whose actual time of occurrence is unknown, the prevailing rule is that time of accrual under the Jones Act or FELA shall be deemed the first time the plaintiff was aware, or should have become aware, of the injury. This limitations guideline is often referred to as the "discovery rule" (*see Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 [1949]; *see also Albertson v. T.J. Stevenson & Co. Inc.,* 749 F.2d 223 [5th Cir.1984]). It appears that the Second Circuit has not yet had reason to pass on this limitations rule. However, as a general rule, a claim accrues when the plaintiff knows or has reason to know of the injury that forms the basis of the action (*see Cullen v. Margiotta,* 811 F.2d 698 [2d Cir.] *cert. denied* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 [1987]).

The Uniform Statute of Limitations for Maritime Torts also provides for a three-year limitations period for maritime torts (*see* 46 U.S.C. § 763a "a suit for recovery of damages for personal injury ... arising out of a maritime tort, shall not be maintained unless commenced within three

years *of the date the cause of action ac-crued*").

It is clear that Puthe had reason to know that he was suffering from some psychological ailment as early 1985. Puthe has stated that it was during his voyage aboard the Exxon Lexington in or about November or December 1985, that he first realized he *was not in control of his emotions or his* life and that he had a problem (*see* Plt's Depo. pp. 26–27; Def.Ex. 2—sailing record). In regard to his 1985 assignment aboard the Exxon Lexington, he recognized that "the stress was too great to handle at the time" (Plt's Depo. pp. 84–85).

Puthe commenced this action on May 29, 1989 claiming that he first learned of his injury in August of 1986. However, the plaintiff stated that nothing occurred during 1986 that contributed toward his cause of action (*see* Plt's Depo. pp. 107–108). Yet the plaintiff contends that his action is timely because under the discovery rule, a statute of limitations begins to run only when the plaintiff "becomes aware not only of his disease but also of its cause" (*see Jones v. Maine Cent. R. Co.,* 690 F.Supp. 73, 74 [D.Me.1988] ). Thus, because Puthe allegedly did not learn that his psychological problems were caused by his occupation until August, 1986, he contends that the statute of limitations under the FELA and the USLMT would not have expired until August of 1989.

However, even assuming such an application of the discovery rule, the plaintiff's action is still untimely. The record bears out that the plaintiff had reason to know of his psychological problems during his assignment aboard the Exxon Lexington in late 1985. In fact, the record shows that he attributed such problems to the stress attendant to his sailing duties on the Exxon Lexington (Plt's Depo. pp. 84–85).

Accordingly, even assuming that the plaintiff established a claim under the Jones Act or FELA, such claims would be time-barred by 45 U.S.C. § 56 and 46 U.S.C. § 763a.

## CONCLUSION

In light of the foregoing, the plaintiff has failed to demonstrate any legally cognizable acts of negligence or damages so as to sustain a cause of action against the defendant.

Furthermore, even assuming the plaintiff has a claim under the Jones Act or FELA, such claim would be barred under the three year statute of limitations set forth in 45 U.S.C. § 56 (FELA) and 46 U.S.C. § 763a (USLMT).

Accordingly, the motion of the defendant for summary judgment is granted in its entirety.

The Clerk of the Court is directed to close this case and serve on all parties by regular mail a copy of this decision.