January 14, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1473

THEODORE M. ELLENWOOD, ET AL.,

Plaintiffs, Appellees,

v.

EXXON SHIPPING CO.,

Defendant, Appellant.

STATE OF MAINE,

Intervenor.

No. 92-1474

THEODORE M. ELLENWOOD, ET AL.,

Plaintiffs, Appellants,

v.

EXXON SHIPPING CO.,

Defendant, Appellee.

STATE OF MAINE,

Intervenor.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Horny, U.S. District Judge]

Before

Breyer, Chief Judge,

Coffin, Senior Circuit Judge,

and Cyr, Circuit Judge.

Peter Bennett with whom Daniel W. Bates was on brief for the

Ellenwoods.
Thomas D. Warren, Deputy Attorney General, with whom Michael E.

Carpenter, Attorney General, was on brief for the State of Maine.

Robert M. Hayes with whom Charles G. Bakaly, Jr., Richard G.

Moon, and Linda D. McGill were on brief for Exxon Shipping Company.

COFFIN, Senior Circuit Judge. Shortly after the Exxon

Valdez struck a reef off the Alaskan coast in 1989, defendant

Exxon Shipping Company adopted a new policy barring any employee

who had ever participated in an alcohol rehabilitation program

from holding designated jobs within the company. Pursuant to

this policy, plaintiff Theodore Ellenwood, who had no connection

to the Valdez incident, was removed from his position as chief

engineer of another Exxon oil tanker, the Exxon Wilmington.

Ellenwood voluntarily had entered, and successfully had

completed, a month-long alcohol rehabilitation program a year

before the Valdez accident. Despite his concerns about his

drinking, Ellenwood never had had an on-the-job problem with

alcohol. A psychiatrist who examined Ellenwood in connection

with this case concluded, in fact, that he had never been an

alcoholic. See Tr. Vol. V, at 133.

Relying primarily on the company's previous written policy

that "[n]o employees with alcoholism will have their job security

or future opportunities jeopardized due to a request for help or

involvement in a rehabilitation effort," Ellenwood and his wife

brought suit against Exxon alleging tort and contract claims as

well as violations of state statutes prohibiting discrimination

against the handicapped.1 Ellenwood ultimately received a

1 The complaint set forth the following causes of action:
breach of contract (Count I); breach of a duty of good faith
arising out of Exxon's use of confidential information concerning
Ellenwood's alcohol treatment as a basis for removing him (Count
II); estoppel arising out of Exxon's representations and promises
(Count III); wrongful discharge in violation of the public policy
promoting responsible treatment of alcoholism (Count IV);

-3-

judgment for $677,648 on his contract and promissory estoppel

causes of action.

In these appeals, both sides contend, inter alia, that the

district court committed legal error in defining the actionable

counts. Ellenwood claims the judge eliminated too many claims on

various legal grounds, depriving him of additional relief, while

Exxon claims that the court allowed too many counts to be

tried.2 We affirm most of the court's rulings. We conclude,

however, that the district court overestimated the preemptive

effects of admiralty law and the Rehabilitation Act of 1973, 29

U.S.C. 701-796, and, accordingly, we must remand for trial on

Ellenwood's state statutory claims of handicap discrimination.3

discrimination against the handicapped contrary to various state
laws (Count V); misrepresentation over the career consequences of
seeking alcohol treatment (Count VI); intentional and negligent
infliction of emotional distress on both Ellenwoods in ending
Ellenwood's career and disseminating confidential information
concerning his condition (Counts VII and VIII); defamation in
removing Ellenwood from his position as chief engineer (Count
IX); invasion of privacy in the manner in which Exxon obtained
the information about Ellenwood's treatment and disclosed it
(Count X); invasion of privacy in placing Ellenwood in a false
light (Count XI); invasion of privacy in publicizing confidential
information (Count XII); Mrs. Ellenwood's loss of consortium
(Count XIII); and punitive damages (Count XIV).

2 This court granted the State of Maine provisional
permission to intervene on the issue of whether Ellenwood's claim
based on the Maine Human Rights Act, 2A Me. Rev. Stat. Ann. tit.
5, 4571-72 (Supp. 1992), is preempted by federal law.

3 The complaint referred to statutes in Maine, New Jersey
and Texas, and we offer no view as to the applicable law. We
note, however, that the district court applied Texas law to Count
XII of the complaint, which alleged an invasion of privacy. See

Memorandum of Decision, Oct. 28, 1991.

-4-

I. Preemption and the Rehabilitation Act4

A. Background

Section 503 of the Rehabilitation Act of 1973, 29 U.S.C.

793, requires any contract with the federal government in excess

of $2,500 to include a provision obligating the federal

contractor to "take affirmative action to employ and advance in

employment qualified individuals with handicaps." 29 U.S.C.

793(a). Any handicapped individual who believes a contractor has

failed to comply with this provision may file a complaint with

the Department of Labor, which must conduct an investigation and

take appropriate action. 29 U.S.C. 793(b). Regulations

promulgated pursuant to 503 specify a detailed administrative

enforcement mechanism for its breach. See 41 C.F.R. 60-741.1-

741.32 (1991). The Department's Office of Federal Contract

Compliance Programs (OFCCP) is empowered, for example, to seek

injunctive relief in court, terminate or cancel a contract, or

bar a contractor from receiving future contracts. 41 C.F.R.

60-741.28(b)-(e) (1991). It also may seek such remedies as back

pay and reinstatement for affected employees. See Dep't of Labor

v. Texas Indus., Inc., 47 Fair Empl. Prac. Cas. (BNA) 18, 28

(Dep't Labor 1988). See Howard v. Uniroyal, Inc., 719 F.2d 1552,

1559 (11th Cir. 1983) (detailing enforcement procedures).

In a motion for summary judgment, Exxon, which is a federal

contractor, argued that 503 preempts virtually all of

4 Our review of the district court's preemption decisions,
which were rulings of law, is plenary.

-5-

Ellenwood's state law claims,5 and that Ellenwood's only

recourse on matters related to his alcohol treatment is the claim

he has filed with the OFCCP. The district court rejected this

contention, finding no evidence that Congress intended the

provision to eliminate conventional state law claims such as

breach of contract, misrepresentation, defamation or infliction

of emotional distress, because these claims "are in no way

related to the federal Rehabilitation Act, any affirmative action

clause in a government contract, or handicap discrimination."

See Memorandum of Decision, Oct. 15, 1991, at 3. The court also

ruled, however, that 503 did preempt Count V's direct claim of

discrimination on the basis of handicap in violation of various

state statutes, and Count IV's common law claim that Ellenwood's

discharge violated a public policy promoting responsible

treatment of alcoholism.

Neither party is satisfied with this Solomonic division of

the claims. Accordingly, on appeal, we are asked to consider

both Ellenwood's claim that the district court erred in ruling

that 503 preempts Counts IV and V and Exxon's contrary

assertion that the district court erred in finding that the

federal statute does not preempt the contract and promissory

estoppel claims on which Ellenwood received a jury verdict. The

State of Maine joins Ellenwood in arguing that 503 does not

preempt a claim of handicap discrimination brought under its

5 According to Exxon, only Counts X and XII of the
complaint, charging the company with obtaining and disclosing
private information, survived preemption.

-6-

Human Rights Act, 2A Me. Rev. Stat. Ann. tit. 5, 4571-72 (Supp.

1992). We take up each plea for reversal in turn, following a

brief review of the well established contours of preemption law.

B. Preemption Principles

The preemption doctrine is rooted in the Supremacy Clause,

which invalidates state laws that "interfere with, or are

contrary to, the laws of congress." Gibbons v. Ogden, 22 U.S. (9

Wheat.) 1, 211 (1824). See also Cipollone v. Liggett Group,

Inc., 112 S. Ct. 2608, 2617 (1992). A court's sole task in

determining whether a state statute is preempted is to ascertain

whether Congress intended the federal law to have such effect.

California Federal Savings & Loan Ass'n v. Guerra, 479 U.S. 272,

280 (1987); Massachusetts Medical Society v. Dukakis, 815 F.2d

790, 791 (1st Cir. 1987). Although Congress may articulate its

intent explicitly, see, e.g., Jones v. Rath Packing Co., 430 U.S.

519, 532 (1977), it does not always do so, and the challenge of

preemption law is to identify occurrences of implied preemption.

Preemption by implication may take place in different ways.

First, congressional intent to preempt state law may be

inferred when the scheme of federal regulation in a particular

area is sufficiently pervasive and complex "to make reasonable

the inference that Congress `left no room' for supplementary

state regulation," California Federal Savings & Loan Ass'n, 479

U.S. at 281 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S.

218, 230 (1947)); see also Dukakis, 815 F.2d at 791. Second, in

areas where Congress has not entirely displaced state regulation,

-7-

state law will be deemed preempted to the extent it actually

conflicts with federal law. Such a conflict occurs either

because "`compliance with both federal and state regulations is a

physical impossibility,'. . . , or because the state law stands

`as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress.'" California Federal Savings

& Loan Ass'n, 479 U.S. at 281 (quoting Florida Lime & Avocado

Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963) and Hines v.

Davidowitz, 312 U.S. 52, 67 (1941)). See also O'Brien v.

Consolidated Rail Corp., 972 F.2d 1, 3 (1st Cir. 1992).

These alternative avenues to preemption do not mean that

either route is to be chosen lightly. The Supreme Court recently

reiterated the longstanding principle that "`the historic police

powers of the States [are] not to be superseded by . . . Federal

Act unless that [course is] the clear and manifest purpose of

Congress.'" Cipollone, 112 S. Ct. at 2617 (quoting Rice, 331

U.S. at 230). Thus, the presumption is against preemption. Id.

at 2618.

C. Applying the Principles

1. State handicap discrimination statutes.

Section 503 contains no express language regarding

preemption. Our task, therefore, is to determine whether there

are other indicia of Congressional intent to render state

discrimination laws ineffectual against federal contractors.

Exxon essentially makes a two-pronged argument. First, it cites

legislative history suggesting that Congress sought a uniform

-8-

federal remedy for violations of 503, which would be frustrated

if contractors additionally were subject to varying state laws.

Thus, according to Exxon, Congress must have intended to preempt

state provisions.

Second, Exxon suggests that the detailed nature of the

administrative scheme promulgated under 503 demonstrates

Congress's intent to foreclose other types of remedies against

federal contractors. Exxon maintains that, while Congress has

not fully occupied the field of handicap discrimination, with

respect to federal contractors, it has "`left no room' for

supplementary state regulation," California Federal Savings &

Loan Ass'n, 479 U.S. at 281.

In our view, what Exxon offers as proof of an intent to

preempt falls short of the mark. The legislative history on

which the company relies is a single passage in a Senate

Committee Report relating to amendments to the Rehabilitation Act

that were enacted a year after the Act itself. The amendments

made no change in either sections 503 or 504 of the Act,6 but

the Senate Report commented:

It is intended that sections 503 and 504 be
administered in such a manner that a consistent,
uniform, and effective Federal approach to
discrimination against handicapped persons would
result. Thus, Federal agencies and departments should
cooperate in developing standards and policies so that
there is a uniform, consistent Federal approach to
these sections.

6 Section 504, 29 U.S.C. 794, prohibits discrimination
against the handicapped in federally funded programs, the United
States Postal Service, and in Executive agencies.

-9-

S. Rep. No. 1297, 93d Cong., 2d Sess., reprinted in 1974

U.S.C.C.A.N. 6373, 6391.

Exxon claims this passage demonstrates that Congress was

seeking an exclusive approach to handicap discrimination by

federal contractors, and that, consequently, it must have

intended 503 to displace parallel state laws governing the same

conduct. Even without regard for the lesser weight accorded this

subsequent history than would be accorded contemporaneous

legislative comments, see Heckler v. Turner, 470 U.S. 184, 209

(1985), we believe Exxon has read far too much into the quoted

remarks.

We are persuaded that the passage in no way implicates state

law but instead reflects Congress's concern about the lack of

coordination on the federal level between the two agencies

responsible for implementing sections 503 and 504. The Senate

Report continues from the portion quoted above to elaborate on

the agencies' relationship:

The Secretary of the Department of Health, Education,
and Welfare, because of that Department's experience in
dealing with handicapped persons and with the
elimination of discrimination in other areas, should
assume responsibility for coordinating the section 504
enforcement effort and for establishing a coordinating
mechanism with the Secretary of the Department of Labor
to ensure a consistent approach to the implementation
of sections 503 and 504.

S. Rep. No. 1297, 93rd Cong., 2d Sess., reprinted in 1974

U.S.C.C.A.N. 6373, 6391. In our view, Congress was calling for a

more uniform and consistent "Federal approach to discrimination

against handicapped persons," id. (emphasis added); nothing in

-10-

the passage indicates that it was seeking to eliminate any role

for state law. See D'Amato v. Wisconsin Gas Co., 760 F.2d 1474,

1482 (7th Cir. 1985) (by insisting on coordination, Congress was

directing "that the two responsible agencies were not to work at

cross purposes or to duplicate each other's efforts") (citation

omitted).

Exxon's second basis for inferring an intent to preempt --

the comprehensive and detailed regulations promulgated under

503 -- is equally unavailing. The fact that Congress has

implemented an extensive regulatory scheme in a particular area

does not lead necessarily to the conclusion that it intended to

displace parallel state remedies. As the Supreme Court stated in

Hillsborough County v. Automated Medical Laboratories, Inc., 471

U.S. 707, 716-18 (1985):

To infer pre-emption whenever [a federal agency] deals
with a problem comprehensively is virtually tantamount
to saying that whenever a federal agency decides to
step into a field, its regulations will be exclusive.
Such a rule . . . would be inconsistent with the
federal-state balance embodied in our Supremacy Clause
jurisprudence.

See also R.J. Reynolds Tobacco Co. v. Durham County, 479 U.S.

130, 149 (1986) (preemption should not be inferred simply because

federal agency's regulations are comprehensive). Exxon cites

nothing in the state provisions that would make compliance with

both state law and the detailed 503 scheme a "physical

impossibility," Florida Avocado & Lime Growers, 373 U.S. at 143,

and, in the absence of other evidence of preemptive intent, there

is no basis for displacing the state law.

-11-

In accepting Exxon's argument that Congress intended to

preempt state anti-discrimination remedies against federal

contractors, the district court relied entirely on the analysis

of the Eleventh Circuit in Howard v. Uniroyal, Inc., 719 F.2d

1552 (1983). In Howard, the plaintiff had alleged a claim under

Alabama law as a third party beneficiary of the 503 affirmative

action clause contained in contracts between his employer and the

federal government.

The Eleventh Circuit rejected this claim. It held that

state contract remedies could not be used to enforce 503

essentially for the reasons Exxon has offered to us in support of

its preemption argument. Emphasizing the Senate Report's

reference to federal uniformity and the comprehensiveness of the

503 administrative scheme, the Howard court found it

"reasonable to infer that Congress left no room in section 503(b)

for state contract actions to supplement it," id. at 1559. The

court concluded that allowing the plaintiff to broaden

enforcement of the affirmative action clause by means of state

law could frustrate directly the specific scheme designed by

Congress, allowing a private claim through the back door that

couldn't come through the front door.

An inference of preemption was further warranted, the court

held, because Congress's substantial interest in enforcing the

affirmative action clause -- determining appropriate terms,

conditions and remedies -- was "more substantial" than the

-12-

state's interest in providing a remedy for third party

beneficiaries seeking to enforce the same clause. Id. at 1561.

We believe Exxon and the district court have relied unwisely

on Howard, which differs from this case in a crucial respect.

There, the plaintiff sought to use state law to enforce 503

itself; the court ruled that Congress intended the federal

administrative remedy to be the plaintiff's sole means of

enforcing the affirmative action clause. Here, however,

Ellenwood is seeking to enforce not 503, but independent

obligations created by state anti-discrimination statutes.

The claim in this case does not threaten the uniformity of

the 503 system. Rather, the issue here is one of

compatibility, specifically, whether there is any basis for

inferring that Congress believed an independent state remedy

could not co-exist with the 503 system. Howard is not helpful

in this context. In the employment discrimination field,

Congressional enactments "have long evinced a general intent to

accord parallel or overlapping remedies against discrimination."

Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974). See

also California Federal Savings & Loan, 479 U.S. at 282-83;

Kremer v. Chemical Construction Corp., 456 U.S. 461, 468-69

(1982); Muncy v. Norfolk and Western Railway Co., 650 F. Supp.

641, 644 (S.D.W. Va. 1986) (ruling that 503 does not preempt

state human rights act). Nothing in 503, which is focused

narrowly on the contractual requirement for an affirmative action

-13-

clause, provides a basis to infer a departure from that

traditional approach.

In addition, several references in 503's legislative

history suggest that, rather than seeking to preempt state law

through comprehensive legislation, Congressional leaders

recognized that the federal statute was a modest one:

"We are just beginning to do too little as the
dimension of the problem grows in geometric
proportion." Congressman Vanik, Congressional Record -
- House 18137 (June 5, 1973); "[W]e have only begun to
scratch the surface in meeting the needs of our
disabled fellow citizens." Congressman Brademus [sic],
Congressional Record -- House 30149 (September 18,
1973); "I do not consider [this bill] to be a perfect
bill, or in all honesty, even an adequate bill."
Senator Randolph, Congressional Record -- Senate 34586
(July 18, 1973).7

Raytheon Co. v. Fair Employment and Hous. Comm'n, 46 Fair Empl.

Prac. Cas. (BNA) 1089, 1099 (Cal. Sup. Ct. 1988), aff'd, 212 Cal.

App. 3d 1242, 261 Cal. Rptr. 197 (2d Dist. 1989).

A year later, in the Rehabilitation Act Amendments of 1974,

Congress added a provision requiring state agencies that

administer programs funded under the Act to take affirmative

action to employ and advance qualified handicapped individuals

who are covered under 503. See Senate Report No. 1297,

reprinted in 1974 U.S.C.C.A.N., at 6391-92. The Senate Committee

Report noted that these agencies "are expected to adopt strong

affirmative action programs which are at least equivalent to

those now being developed for Federal agencies." Id. at 6392

7 Both Congressman Brademas and Senator Randolph were among
the managers of the legislation. See Conf. Rep. No. 500, 93rd

Cong., 1st Sess., reprinted in 1973 U.S.C.C.A.N. 2143, 2154.

-14-

(emphasis added). These comments, although referring to

administering agencies rather than federal contractors,

nevertheless suggest that Congress both acknowledged the role

played by states in the area of handicap discrimination and

assumed that states might choose to provide different -- greater

-- protection than that afforded by the federal government. See

Raytheon, 46 Fair Empl. Prac. Cas., at 1099.8

Finally, we note that, in the recent Americans with

Disabilities Act of 1990, 42 U.S.C. 12101-12213, which amended

the Rehabilitation Act and extended remedies for handicap

discrimination against many more private employers, Congress

stated explicitly that the legislation did not "limit the

remedies, rights, and procedures of any . . . law of any State .

. . or jurisdiction that provides greater or equal protection for

the rights of individuals with disabilities than are afforded by

this chapter." 42 U.S.C. 12201(b). While this provision

obviously can have no effect on our view of Congressional intent

in 1973, it is a particularly pertinent example of Congress's

historical practice of allowing overlapping remedies for

employment discrimination.9

8 We ackowledge that this post-enactment legislative history
is of less weight than contemporary commentary, but it is
nevertheless of some significance. See, e.g., Heckler, 470 U.S.

at 209; Cannon v. University of Chicago, 441 U.S. 677, 686-687,

n.7 (1979).

9 The absence of a provision disclaiming preemption from the
Rehabilitation Act of 1973 does not demonstrate, in the absence
of other evidence, an intent to foreclose state remedies.
Because of its far more comprehensive reach, the ADA is likely to
have appeared more preemptive than the earlier legisation.

-15-

Exxon attempts to distance this case from the tradition of

overlapping remedies in two ways. First, it asserts that

Congress has a unique interest in regulating federal contractors

and, second, it claims that the area of handicap discrimination

requires an extraordinary balancing of competing interests that

distinguishes it from other types of employment discrimination,

such as those involving race, gender or age. In the handicap

discrimination field, Exxon maintains, the possibility of

conflicting judgments is much greater because courts in different

jurisdictions could reach widely disparate conclusions on such

basic questions as what constitutes a "handicap" and which

handicapped persons are "qualified" to hold particular positions.

Restricting individuals to their 503 remedy would ensure that a

federal contractor doing business in more than one state would

face uniform obligations nationwide.

We think it unlikely that Congress has a special interest in

immunizing federal contractors from obligations otherwise

applicable to them under state handicap discrimination statutes.

These companies may do only $2,500 in business with the federal

government, with the bulk of their enterprise devoted to commerce

within a single state. This division gives the state a

substantial interest in protecting the employment interests of

its handicapped citizens. The developing nature of the issues

raised in the field of handicap discrimination strikes us as

Congress evidently made the sensible decision to avoid confusion
by including an express provision.

-16-

insufficient justification for excusing these employers from

obligations imposed on others who differ only in that the federal

government is not one of their customers.

Moreover, Exxon's obligation is not simply to identify

reasons why Congress might have departed from its usual practice,

but to demonstrate a reasonable basis for inferring that Congress

did, in fact, intend to make the federal remedy exclusive in this

single area of employment discrimination law. Exxon has offered

nothing from which we can discern such an intent.

In sum, we find no "clear and manifest" intent on the part

of Congress to preempt state handicap discrimination claims

against federal contractors. Indeed, we find no signals of such

an intent.10

2. Contract and promissory estoppel.

In its appeal, Exxon contends that the district court should

have extended its 503 preemption ruling to Ellenwood's contract

and promissory estoppel claims as well. Exxon points out that

these claims allege that the company breached an agreement or

promise not to discriminate on the basis of Ellenwood's

"handicap" of alcohol abuse. Again relying solely on the

uniformity rationale, Exxon argues that all state claims based on

the same assertedly discriminatory conduct are foreclosed by

503.

10 Our preemption analysis applies as well to Ellenwood's
claim for wrongful discharge based on public policy. We offer no
view, however, as to whether such a claim exists under the
applicable state law.

-17-

Our ruling on the statutory claims also is dispositive here.

We note, however, one instance in which a contract claim based on

statements in a company policy manual may be preempted by 503.

Regulations promulgated under the statute require employers to

post notices of their Rehabilitation Act obligations and of

employee rights under 503 in "conspicuous places." See 41

C.F.R. 60-741.4(d). If an employer included such a notice in

its policy manual solely to comply with this regulation, a state

contract claim based on a breach of the manual provision arguably

would be preempted by the federal law. See Arellano v. Amax Coal

Co., 56 Fair Empl. Prac. Cas. (BNA) 1519, 1524-25 (D. Wy. 1991).

Such a claim, though in the guise of a contract claim based on

the manual, would seem no different from one directly asserting a

breach of 503. A direct claim under 503 unquestionably would

be preempted for the reasons set out in Howard.

Exxon does not contend that the statements at issue here

were required by 503. Indeed, such a contention would be

patently unsupportable. Ellenwood's contract and estoppel claims

are not premised on a general notice of Exxon's affirmative

action obligations toward handicapped individuals, but on a very

specific written assurance from the company that it would not

disadvantage employees for seeking treatment for alcoholism.

We therefore hold that the district court correctly

determined that Ellenwood's contract and estoppel claims were not

preempted by 503.

-18-

II. The Role of Admiralty Law

Our conclusion that 503 does not preempt Ellenwood's state

statutory and common law claims does not end our inquiry into

whether those claims are foreclosed by federal law. Exxon also

contends that, even if 503 does not preempt them, maritime law

does. We consider this contention first as to the state statutes

and second as to the contract and estoppel claims.

A. State handicap discrimination statutes.

In a brief footnote, the district court observed that, even

if it had erred in its judgment about 503 preemption, the state

handicap discrimination claims nevertheless would be foreclosed

because maritime law, rather than state law, governs all issues

surrounding Ellenwood's employment as a chief engineer on board

ship. The court stated that, "I am not aware of any basis under

maritime law for such a recovery." Memorandum of Decision, Oct.

15, 1991, at 4 n.3.

The district court underestimated the role state law plays

in maritime cases. Supreme Court cases make it clear that courts

in admiralty cases may reach beyond maritime precedents and apply

state laws "absent a clear conflict with the federal [maritime]

law," Askew v. American Waterways Operators, Inc., 411 U.S. 325,

341 (1973). See also Romero v. International Terminal Co., 358

U.S. 354, 373-75, 378, n.42 (1959); Just v. Chambers, 312 U.S.

383, 391 (1941); Lyon v. Ranger III, 858 F.2d 22, 27 (1st Cir.

1988); 1 S. Friedell, Benedict on Admiralty 112, at 7-36 (7th

ed. 1991); 14 C. Wright, A. Miller & E. Cooper, Federal Practice

-19-

and Procedure (hereafter Wright & Miller) 3672, at 441-444

(1985).

Exxon contends that this is a case of conflict. It asserts

that applying state non-discrimination statutes in an admiralty

case will contravene federal maritime law by undermining that

"most fundamental and long established characteristic of maritime

law: the need for `harmony and uniformity' of that law." Exxon

Brief at 21 (quoting Southern Pacific Co. v. Jensen, 244 U.S.

205, 216 (1917)). See also Miles v. Apex Marine Corp., 111 S.

Ct. 317, 322-23 (1990) (noting "`the constitutionally based

principle that federal admiralty law should be "a system of law

coextensive with, and operating uniformly in, the whole

country"'") (quoting Moragne v. States Marine Lines, Inc., 398

U.S. 375, 398 (1970) (quoting The Lottawanna, 21 Wall. 558, 575

(1875))); Carey v. Bahama Cruise Lines, 864 F.2d 201, 207 (1st

Cir. 1988).

Once again, however, Exxon heralds the need for uniformity

without an appreciation for the boundaries of its relevance. All

state laws, if given effect in admiralty cases, will interfere to

a degree with the uniformity of admiralty law. See 1 Benedict on

Admiralty 112, at 7-36. But when Congress established a

separate admiralty jurisdiction and empowered the judiciary to

develop substantive maritime principles for use nationwide, 14

Wright & Miller 3671, it simultaneously assured that state law

would continue to play some role in maritime affairs through the

-20-

"saving to suitors" clause.11 This provision allows plaintiffs

to pursue, in addition to maritime relief, ordinary civil

remedies provided by state law, so long as they do not conflict

with the national substantive maritime law. See 14 Wright &

Miller 3672, at 440-444.

Through the years, the Supreme Court has confirmed that

"[t]he State and Federal Governments jointly exert regulatory

powers" in maritime matters, Romero, 358 U.S. at 374, and it is

by now well established that state law is displaced only when it

materially prejudices "the characteristic features of maritime

law," 1 Benedict on Admiralty 112, at 7-36. As we observed in

Carey, "the Supreme Court . . . no longer construes the Admiralty

Clause as requiring `rigid national uniformity in maritime

legislation.'" 864 F.2d at 207 (citation omitted). See also Lyon

v. Ranger III, 858 F.2d at 27; G. Gilmore & C. Black, The Law of

Admiralty, at 49-50 (2d ed. 1975). In other words, a state law

claim should not be dismissed simply because it would result in

differing remedies for plaintiffs in different parts of the

country; such a claim is foreclosed only if the state law in

question frustrates a fundamental tenet of admiralty law. See

11 The Judiciary Act of 1789 granted the federal trial
courts "exclusive original cognizance of all civil causes of
admiralty and maritime jurisdiction," but also reserved to
"suitors, in all cases, the right of a common law remedy, where
the common law is competent to give it." See Southern Pacific

Co., 244 U.S. at 215-216. In its present form, see 28 U.S.C.

1333(1), the clause gives the district courts original
jurisdiction, "exclusive of the courts of the States," of: "Any
civil case of admiralty or maritime jurisdiction, saving to
suitors in all cases all other remedies to which they are
otherwise entitled."

-21-

Steelmet, Inc. v. Caribe Towing Corp., 779 F.2d 1485, 1488 (11th

Cir. 1986).

For example, in Carey, 864 F.2d at 207, we held that a

Massachusetts rule barring tort recovery when a plaintiff is more

than 50 percent negligent could not be applied in a maritime case

because "[o]ne of the essential and longstanding features of

substantive admiralty law is that contributory negligence can be

considered only in mitigation of damages." The rule wholly

foreclosing recovery is "`completely incompatible' with modern

admiralty practice." Id. (quoting Pope & Talbot, Inc. v. Hawn,

346 U.S. 406, 409 (1953)).

Although the rule barring state claims only if they directly

conflict with basic maritime principles often requires "a

delicate accommodation of federal and state interests," Carey,

864 F.2d at 207, we have been shown nothing in substantive

maritime law that is even potentially at odds with state human

rights statutes such as those underlying Count IV of Ellenwood's

complaint. Congress's only legislation in the area of

handicapped rights has not been directed at maritime cases and,

as discussed supra, its legislation did not preempt state

remedies. We find no indications that the absence of substantive

maritime law governing issues concerning individuals with

handicaps reflects a federal interest in protecting maritime

employers from such obligations. See 1 Benedict on Admiralty

112, at 7-37. To the contrary, the Rehabilitation Act's

-22-

applicability to maritime employers demonstrates federal approval

of such obligations.

Thus, the district court's observation that maritime law has

not addressed handicap discrimination specifically is not a

reason to dismiss the state claim but a basis upon which to give

effect to the state provisions. Maritime law historically has

appreciated the leading role of state statutes in creating

additional bases of recovery. In maritime wrongful death cases,

for example, remedies first were provided solely under state law.

See Miles, 111 S. Ct. at 320-23; Moragne v. States Marine Lines,

Inc., 398 U.S. 375, 397 (1970). When Congress enacted maritime

wrongful death legislation in 1920, it provided remedies only

where state law did not. Miles, 111 S. Ct. at 321; Moragne, 398

U.S. at 397-98. State statutes continued to play a primary role

for another fifty years, until the Supreme Court created a

general maritime cause of action for wrongful death. See Miles,

111 S. Ct. at 321-323; Moragne, 398 U.S. at 398-402.12

In its reply brief, the State of Maine notes a possible

concern that strict state standards regarding employment of the

handicapped would conflict with the maritime doctrine of

seaworthiness. The State emphasizes, however, that under its

law, any legitimate physical requirements for crew members under

12 Even today, plaintiffs may invoke state wrongful death
statutes under the saving clause insofar as they involve
accidents in territorial waters and do not conflict with the
substantive principles developed under the maritime wrongful
death doctrine. See Offshore Logistics, Inc. v. Tallentire, 477

U.S. 207, 227 (1986).

-23-

the seaworthiness doctrine would constitute bona fide

occupational requirements that would provide a defense to claims

brought under the statute. See 2A Me. Rev. Stat. Ann. tit. 5,

4572(1) (Supp. 1992). Of course, whether or not a state's

statute specifically included such a defensive provision, vessel

owners obviously could not be held liable for damages under state

anti-discrimination laws when federal maritime principles

required the employer to make the contested employment decision.

In that narrow way, maritime law would be preemptive.

As a general matter, however, we conclude that state human

rights statutes may be applied in maritime cases. Indeed, it

would be anomalous for maritime law, which has always shown "a

special solicitude for the welfare of seamen and their families,"

Miles, 111 S. Ct. at 327, to reject such an employee-sensitive

provision. See also Smith v. Atlas Off-Shore Boat Serv., Inc.,

653 F.2d 1057, 1063 (5th Cir. Unit A 1981) (noting "the admiralty

court's protective attitude towards the seaman). "`[C]ertainly

it better becomes the humane and liberal character of proceedings

in admiralty to give than to withhold the remedy.'" Miles, 111

S. Ct. at 327 (quoting Moragne, 398 U.S. at 387 (quoting Chief

Justice Chase in The Sea Gull, 21 F. Cas. 909, 910 (No. 12,578)

(CC Md. 1865))). See also Austin v. Unarco Industries, Inc., 705

F.2d 1, 6 n.1 (1st Cir. 1983) (state law "is generally referred

to only when it affords greater protection to maritime employees

than that afforded by admiralty law").

B. Contract and promissory estoppel.

-24-

Exxon contends that, in allowing the jury to consider

Ellenwood's contract and estoppel claims, the district court

improperly created an exception to the well-established rule that

maritime employment is terminable at will by either party in the

absence of a contract setting a specific term. According to

Exxon, maritime law has "clung tenaciously" to the at-will

principle, and only one narrow exception previously has been

carved from it. In Atlas Off-Shore Boat Serv., 653 F.2d at 1062-

63, the court permitted a claim for wrongful discharge when a

seaman was fired for filing a personal injury claim that he was

entitled to file by statute. No additional exceptions should be

allowed to erode the strength of the at-will doctrine, Exxon

argues, since the seaman's rights as an employee already are well

protected by federal statute. See generally, e.g., 46 U.S.C.

10302, 10303, 10313, 10502, 10504, 10505, 10506 (prescribing

procedures governing meals, hours and wages for seamen).

Exxon misperceives the district court's ruling. The court

did not devise a new "wrongful discharge" cause of action on

behalf of Ellenwood. It simply recognized the obvious fact that

-- notwithstanding the general rule that a seaman's employment is

at-will -- a maritime employer may make a contractual agreement

with, or an enforceable promise to, its employees.

In this case, Ellenwood claimed that Exxon had promised that

his job security and future opportunities would not be

jeopardized if he sought treatment for alcoholism. The jury

found that the requirements for establishing a binding obligation

-25-

were met. We see no reason why maritime law would invalidate

this self-imposed obligation.13

Accordingly, we affirm the district court's judgment on the

breach of contract and estoppel claims. See infra Section V.

III. Negligent Infliction of Emotional Distress

The jury awarded Theodore Ellenwood $50,000 and his wife

$25,000 on their claims for negligent infliction of emotional

distress. The district court overturned these verdicts on the

ground that maritime plaintiffs may not recover for negligently

caused emotional damages unless they demonstrate accompanying

physical injury or impact.14 The Ellenwoods presented no

evidence of physical harm.

In granting judgment for defendants, the district court

noted that the Supreme Court in Atchison, Topeka and Santa Fe Ry.

13 Exxon does not argue that the district court improperly
instructed the jury on the elements necessary to establish a
contract or promissory estoppel claim in these circumstances, and
we therefore do not delve into this issue. See, e.g., Pearson v.

John Hancock Mutual Life Ins. Co., No. 92-1684, slip op. (1st

Cir. Nov. 10, 1992) (discussing factors necessary to establish
contract based on employee manual).
We do note that, as Exxon recognizes in its reply brief, a
contract must be "reasonably certain" to be enforceable. See

Restatement (Second) of Contracts 33 (1981). An estoppel claim

similarly must be supported by a sufficiently definite promise.
See Santoni v. Federal Deposit Ins. Corp., 677 F.2d 174, 178-79

(1st Cir. 1982). Exxon does not -- and, in our view, cannot
reasonably -- argue that its policy statement assuring no adverse
consequences based on alcoholism treatment is insufficiently
definite to support a contract or estoppel claim.

14 The court very prudently allowed the claims to go to the
jury, thus foreclosing the possibility of a later heavy
investment of time and expense in the event that it should render
a judgment notwithstanding the verdict and that we would
disagree.

-26-

Co. v. Buell, 480 U.S. 557, 568 (1987), had raised the

possibility of recovery for purely emotional injury in cases such

as this one.15 The court recognized, however, that our circuit

has had no opportunity since Buell to consider the issue. See

Moody v. Maine Cent. Ry. Co., 823 F.2d 693, 694 (1st Cir. 1987)

(declining to consider physical injury requirement because

plaintiff failed to show causation). It therefore relied on our

decision in Bullard v. Central Vermont Ry., 565 F.2d 193, 197

(1st Cir. 1977), to hold that a physical injury is a prerequisite

for recovery of emotional distress damages.16

In the aftermath of Buell, recovery for wholly emotional

injury under the Jones Act and FELA has become an "important and

recurring issue" of federal law. Ray v. Consolidated Rail Corp.,

112 S. Ct. 914 (1992) (White, J., dissenting from denial of

certiorari).17 The circuits vary in their treatment of such

claims. See, e.g., Ray v. Consolidated Rail Corp., 938 F.2d 704,

705 (7th Cir. 1991) (no recovery under FELA unless injury results

15 Buell involved a claim brought under the Federal

Employers Liability Act (FELA), 45 U.S.C. 51-60, which creates
a negligence cause of action for railroad workers against their
employers. The Jones Act, 46 U.S.C. App. 688, creates the same
cause of action for seamen, and incorporates by reference the
FELA. Caselaw developed under both statutes guides subsequent
interpretation of either of them. See Mitchell v. Trawler Racer,

Inc., 362 U.S. 539, 547 (1960); Gaston v. Flowers Transp., 866

F.2d 816, 817 (5th Cir. 1989).

16 Recovery for wholly emotional injuries was not at issue
in Bullard because the plaintiff also had injured his foot. See

565 F.2d at 197 & n.3.

17 Ray was, in fact, an FELA case, but, as noted earlier,

see supra note 15, FELA jurisprudence applies to Jones Act cases.

-27-

from physical contact or threat of physical contact); Taylor v.

Burlington Northern R.R. Co., 787 F.2d 1309, 1313 (9th Cir. 1986)

(claims for wholly mental injury are cognizable); Holliday v.

Consolidated Rail Corp., 914 F.2d 421, 426-27 (3d Cir. 1990)

(rejecting specific claim, but suggesting that, under the right

circumstances, emotional distress damages may be recoverable);

Gaston v. Flowers Transp., 866 F.2d 816, 821 (5th Cir. 1989)

(same).18

On appeal, plaintiffs urge us to hold explicitly that a

seaman may recover emotional distress damages without showing a

physical injury. Resolving this issue requires not only careful

analysis of the specific facts of the case at hand, but also a

review of common law jurisprudence and policy considerations.

Buell, 480 U.S. at 568-70. As the Supreme Court noted in Buell,

state court decisions reveal a number of "doctrinal divergences"

concerning intentional and negligent infliction of emotional

distress. Id. at 569-70. The Court therefore theorized that

recovery for emotional injury "might rest on a variety of subtle

and intricate distinctions related to the nature of the injury

and the character of the tortious activity." Id. at 568. It

18 In Plaisance v. Texaco, Inc., 937 F.2d 1004, 1009 (5th

Cir. 1991), a divided panel of the Fifth Circuit announced a
broad rule permitting recovery for negligently caused emotional
injury, but denied recovery in the instant case because the
accident was so unexceptional that the significant emotional
injury sustained by a tugboat captain was not reasonably
foreseeable. Subsequently, in an en banc ruling, the circuit

affirmed the denial of recovery but withdrew the broad ruling of
law. 966 F.2d 166 (1992). The Supreme Court denied certiorari.
See 61 U.S.L.W. 3400 (U.S. Nov. 30, 1992).

-28-

concluded its discussion by cautioning that, in this area of law,

"broad pronouncements . . . may have to bow to the precise

application of developing legal principles to the particular

facts at hand." Id. at 570.

Because the Ellenwoods have failed to present their claims

of negligence with particularity, this is not an appropriate case

in which to undertake such a substantial inquiry. Counts VII and

VIII of the complaint, in the words of the district court,

alleged "intentional and negligent infliction of emotional

distress on both Mr. and Mrs. Ellenwood in ending Ellenwood's

career and disseminating confidential information concerning his

condition." Memorandum of Decision, Oct. 15, 1991, at 2.

Neither the complaint nor the Ellenwoods' briefs, however,

specifically identifies the negligent acts of commission or

omission.19 In closing argument, plaintiffs' counsel referred

in one sentence, in conclusory terms, to the negligent infliction

claim.20

19 For example, was the alleged breach of contract the
asserted negligent action? Or was it the manner in which the new
policy was devised? or communicated? or applied? Was the
disclosure of Ted Ellenwood's alcohol treatment negligent? If
so, how? Instead of specifically identifying the allegedly
unreasonable conduct that constituted a breach of duty,
plaintiffs apparently assumed that we could, and would, discern
from the underlying facts one or more bases for their negligence
claims. This approach dates back to plaintiffs' complaint, where
they simply incorporated by reference the factual background
underlying the other causes of action to support the negligence
claims. See Complaint at 88-90.

20 Following lengthy discussions of the contract, promissory
estoppel and intentional infliction of emotional distress claims,
counsel stated:

-29-

The lack of attention devoted to this claim is further

illustrated by plaintiffs' assertion that Ted Ellenwood's

negligence cause of action was brought under general maritime

law, not the Jones Act. See, e.g., Tr. Vol. XII, at 7. In fact,

the Jones Act provides the exclusive recovery in negligence for

claims by seamen against their employers. See Miles v. Apex

Marine, 111 S. Ct. 317, 324 (1990) (Jones Act was a response to

The Osceola, 189 U.S. 158 (1903), which established that seamen

could recover under general maritime law for injuries resulting

from unseaworthiness but not negligence); Beltia v. Sidney Torres

Marine Transport, Inc., 701 F.2d 491, 493 (5th Cir. 1983) (Jones

Act is "the sole basis upon which a seaman or his beneficiaries

may sue his employer for negligence") (citation omitted).

I suggest to you that even if you don't find
outrageousness [an element of the intentional
infliction tort], you should still return a verdict of
negligent infliction of mental distress. I feel,
however, very strongly that intentional infliction of
emotional distress has been shown because of this
policy itself and the actions Exxon Shipping Company
took against him deliberately after this policy came
into effect.

Tr. Vol. XI, at 98.

The court's instructions on the negligence count also were
framed broadly. The court told the jury that the plaintiff must
prove that (1) Exxon acted or failed to act as "a reasonably
prudent corporation would act in the management of its affairs;"
(2) that "severe emotional distress" to plaintiffs was
foreseeable; and (3) that plaintiffs suffered such distress as a
result of negligence. See Tr. Vol. XI, at 47.

-30-

Ellenwood's general maritime cause of action could be dismissed

for that reason alone.21

The Supreme Court in Buell only speculated that some claims

for purely emotional injury may be brought under the FELA. See

Moody, 823 F.2d at 694 (door to recovery only "somewhat ajar").

Conducting the particularized review needed to evaluate such a

claim here would require a detailed examination of Exxon's

assertedly negligent conduct, its context, and its impact on the

Ellenwoods. Arguably, even in a routine case, it would be

inappropriate for us to construct a theory of negligence so that

we could analyze a claim of apparently little importance to the

plaintiffs. A fortiori, we would be ill-advised to do so here,

where we are asked to take a precedential step with a highly

circumscribed license from the Supreme Court.22

21 Although Mrs. Ellenwood's claim arises under general
maritime law, the limitations on recovery contained in the Jones
Act nonetheless are relevant because her claim is based on
assertedly negligent conduct governed by the statute. See

generally Miles v. Apex Marine, 111 S. Ct. at 327 ("We sail in

occupied waters. Maritime tort law is now dominated by federal
statute . . . .").

22 We note that the viability of emotional distress claims
based on management policy decisions and other day-to-day
interactions between employees and employers is a particularly
sensitive matter. See, e.g., Holliday v. Consolidated Rail

Corp., 914 F.2d 421, 425, 427 (3d Cir. 1990); Lancaster v.

Norfolk and Western Ry. Co., 773 F.2d 807, 813 (7th Cir. 1985);

Puthe v. Exxon Shipping Co., No. 89-CV-1619, 1992 U.S. Dist.

LEXIS 14950, at *33-34 (E.D.N.Y. Sept. 26, 1992). Additionally,
we question whether a case such as this, whose dominant claim is
that the defendant intentionally reneged on a promise, presents
the sort of tortious conduct properly compensable under the Jones
Act.

-31-

We decline to explore the frontiers of the negligent

infliction tort in these circumstances. Accordingly, the

district court's judgment vacating the Ellenwoods' damage awards

is affirmed.23

IV. Punitive Damages

The Ellenwoods contend that the district court erred in

refusing to submit their punitive damages claim to the jury.

This argument faces a threshold barrier because the Ellenwoods

have prevailed so far only on contractual claims, which

ordinarily do not support an award of punitive damages. See

Restatement (Second) of Contracts 355 (1981)24; Thyssen, Inc.

v. S.S. Fortune Star, 777 F.2d 57, 62-63 (2d Cir. 1985). See

generally Molzof v. United States, 112 S. Ct. 711, 715 (1992)

(noting common law understanding that punitive damages were

awarded "to punish defendants for torts committed with fraud,

actual malice, violence, or oppression") (emphasis added).

23 We find no merit in plaintiffs' assertions of error
concerning their claims for intentional infliction of emotional
distress. The instructions accurately reflected prevailing law,
see Restatement (Second) of Torts 46 cmt. d, and the court's

evidentiary decisions fell well within its broad discretion, see

Harrison v. Sears, Roebuck and Co., No. 92-1055, slip op. at 6-7

(1st Cir. Dec. 9, 1992) (expert testimony); Elgabri v. Lekas, 964

F.2d 1255, 1261 (1st Cir. 1992) (Rule 403).

24 This provision states:

Punitive damages are not recoverable for a breach of
contract unless the conduct constituting the breach is
also a tort for which punitive damages are recoverable.

-32-

Despite the general principle, the Ellenwoods contend that

an award of punitive damages is permissible here because their

claim involved breach of a non-contractual legal duty not to

discriminate on the basis of a perceived handicap and,

consequently, contractual limitations on damages are

inapplicable. See Reply Brief at 22. They seek support from our

decision upholding punitive damages for a shipowner's willful and

callous withholding of a seaman's maintenance and cure in

Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1051-52 (1st Cir.

1973). There, we emphasized the Supreme Court's statement in

Vaughan v. Atkinson, 369 U.S. 527, 532 (1962), that

"[m]aintenance and cure differs from rights normally classified

as contractual" because "the duty to provide maintenance and cure

`is imposed by the law itself as one annexed to the employment.'"

Robinson, 477 F.2d at 1052 (citation in Vaughan omitted).

This argument assumes that the Ellenwoods proved more than a

breach of contract. They have not. In Robinson, punitive

damages were permissible because the "`[t]he duty to provide

maintenance and cure is in no real sense contractual, and a suit

for failure to provide maintenance or cure can hardly be equated,

therefore, with an action for breach of contract,'" 477 F.2d at

1052 n.3 (quoting Vaughan, 369 U.S. at 534 (Stewart, J.,

dissenting)). Ellenwood's proven breach of contract and

promissory estoppel claims did not arise from a duty "imposed by

the law itself," Robinson, 477 F.2d at 1052, but from Exxon's

self-imposed obligation not to jeopardize the job security or

-33-

future opportunities of employees who sought treatment for

alcoholism. The Ellenwoods have cited no maritime decision

awarding punitive damages for breach of this type of contractual

obligation. See Thyssen, Inc., 777 F.2d at 62 (no case found in

which admiralty court awarded punitive damages for breach of

contract).

We are aware of a recent trend to permit punitive damages in

the contract setting in a narrow range of circumstances. See 5

A. Corbin, Corbin on Contracts 1077 (1964 and Supp. 1992).

This practice has been deemed appropriate when the breaching

party acted with "[t]he state of mind which accompanies an

intentional tort." id. (Supp.) at 179. In this case, the jury

found against the Ellenwoods on their intentional tort claims.

Plaintiffs, however, maintain that this finding should not

foreclose punitive damages because they claim that the standard

for punitive damages under maritime law is less demanding than

the standard for intentional infliction of emotional distress.

See Restatement (Second) of Torts 46; Muratore v. M/S Scotia

Prince, 845 F.2d 347, 354 (1st Cir. 1988) (maritime standard).

And so, plaintiffs contend that the rejection of their

intentional tort claims is not fatal to an award of punitive

damages.

Assuming that maritime law would permit a limited role for

punitive damages in the contract setting -- an issue we do not

reach -- we think it inconceivable that such damages would be

available when the jury specifically has rejected plaintiffs'

-34-

accompanying intentional tort claims. Thus, even if punitive

damages may be awarded under maritime tort law based on conduct

that would not satisfy the standard for intentional infliction of

emotional distress, we decline to hold that they may be awarded

for breach of contract in these circumstances.

Whether punitive damages may be available should Ellenwood

prevail upon remand on the handicap discrimination claims is an

issue not before us today. At the moment this is solely a

contract case, and we adhere to the settled rule of law

prohibiting such an award.

V. Burden of Proof

Exxon attempted to prove at trial that, even if Ellenwood

had not been removed from his chief engineer's post in April

1989, he would have lost his job later in the year when Exxon

downsized its fleet. Consequently, because Exxon continued to

pay Ellenwood's full salary and benefits through January 1991,

the company argued that Ellenwood was not entitled to any damages

for breach of contract or promise.

On appeal, Exxon claims that the district court incorrectly

instructed the jury that the company bore the burden of proving

that Ellenwood would have been terminated for bona fide reasons

unrelated to the new alcohol rehabilitation policy. The burden

should have been placed on the plaintiff, Exxon asserts, and this

error entitles the company, at a minimum, to a new trial on the

contract and estoppel claims.

-35-

We find it unnecessary to consider this issue on the merits

because we conclude that Exxon failed to preserve it. At two

separate times, once before the jury charge and once after it,

the court and counsel discussed the instruction on this defense.

On the first occasion, during the precharge conference, the court

announced its decision to impose the burden on the defendant to

prove that Ellenwood would have lost his job for independent

reasons, and twice repeated its intention to give such an

instruction. See Tr. Vol. XI, at 24, 28, 29.

At that time, Exxon responded by asking the court to

include, within the "independent reasons" portion of the jury

charge, a sentence about "business judgment." This addition

would have emphasized to the jury that, in considering whether

Ellenwood would have been terminated as a result of the fleet's

downsizing, it was not permitted to second-guess Exxon's business

judgment in devising and applying its ranking system. See Tr.

Vol. XI, at 26. The ensuing discussion focused on how to

communicate to the jury that its task was limited to determining

whether the ranking system was a pretext. The instruction

ultimately adopted by the court included language suggested by

Exxon's counsel. Id. at 29. At no time during this discussion

did counsel object to the court's imposing the burden on Exxon.

Subsequently, the district court instructed the jury that

"Exxon Shipping has the burden of proof to show you that Mr.

Ellenwood would have lost his job for independent, nonpretextual

reasons," see Tr. Vol. XI, at 51. Following the full charge on

-36-

all claims, the district court held a sidebar conference in which

it heard and responded to both sides' objections. At that time,

Exxon's counsel requested an "additional instruction" on damages

for breach of contract or promise.

The proposed addition consumes 43 lines in the trial

transcript. See Tr. Vol. XI, at 64-66.25 The first four

paragraphs contained essentially the instruction on business

judgment that Exxon had requested earlier. See Tr. Vol. XI, at

65 ("You may not consider whether in your opinion the evaluations

or the rankings are appropriate or were done in a manner you

agree with.). The next section opens with the assertion that

"[t]he sole question you are to consider is whether Exxon

Shipping maintained its employee ranking list in good faith,"

id., and then states that, in deciding the question, "plaintiffs

have the burden of proof." Id. The proposal goes on to

elaborate on the plaintiff's burden, i.e., to show "by a

preponderance of the evidence that Exxon Shipping manipulated or

otherwise misused its ranking procedure in bad faith to cause Mr.

Ellenwood to be ranked lower on the ranking list of chief

engineers than he otherwise would have been." Id. at 65-66.

The district court gave the following response to Exxon's

proposal:

So far as the requested lengthy instruction . . .
by the defendant involving rank, proximate cause, good
faith, management practices and so on, I am satisfied
that would involve me in too great a commentary on the

25 The requested instruction is reproduced in its entirety
in an appendix to this opinion.

-37-

evidence. Instead, I've given a general charge
concerning the issue of whether Exxon would otherwise
have terminated him, required only that its reasons be
independent and not pretextual. I believe that that
adequately meets the standards in this area.

Tr. Vol. XI, at 72. It appears that the district court focused

primarily, if not exclusively, on the first portion of Exxon's

lengthy request and concluded that its own pretext instruction

adequately met Exxon's concern that the jury not consider how

good the ranking system was but only whether it was used in good

faith. Exxon made no further response and did not inform the

court that it also was concerned about who had the burden on this

issue.

What Exxon did here was not enough to entitle it to assert

this issue on appeal as a basis for a new trial. Counsel did not

object to the court's burden instruction, but proposed only an

addition. The proposal was long and, in its latter portion,

contradicted the court's earlier instruction on burden. When the

court reacted with comments apparently directed only to the first

part of the proposal, counsel made no effort to highlight its

concern regarding the burden. This omission is particularly

significant in light of the earlier discussion, which focused

solely on the business judgment rule.

Similarly, in its post-trial memorandum seeking a new trial

on the contract and estoppel claims, under the heading "Employee

Rankings," Exxon argued only that the court erred "in declining

to instruct the jury that it could not second guess the business

judgment of Exxon Shipping with respect to its performance

-38-

evaluations and employee ranking system." See Memorandum, at 9.

Again, no reference was made to the burden of proof.

Not until its reply brief on appeal did Exxon articulate

clearly and concisely its burden of proof objection. It is well

established, the company now contends, that the burden of proving

bad faith must be on the party seeking to show it because

"[d]isproving bad faith is almost always close to impossible."

Reply Brief, at 17. Because the issue here was not the quality

of Exxon's ranking system, but whether the system was maintained

in good faith, the company claims the burden should have been on

Ellenwood to prove that Exxon manipulated its rankings in bad

faith.

We do not reach this argument because it is too late. To

consider disassembling the court and jury's substantial work

without clearer notice than Exxon gave to the district court

would be to snub the requirement in Fed. R. Civ. P. 51 that a

party must "stat[e] distinctly the matter objected to and the

grounds of objection." Accordingly, we leave undisturbed the

district court's judgment on the contract and estoppel claims.

VI. Benefits Offset

Exxon has claimed error in the district court's instruction

to the jury not to offset the damages award by the amount of

special retirement benefits the company has paid or will pay to

Ellenwood. Under a "special sea service plan," Exxon contributed

to an annuity that distributed monthly payments to retired

-39-

employees in amounts based on life expectancy. Ellenwood began

receiving annuity payments of nearly $20,000 a year following his

retirement in 1991 at age 45. It is these payments that Exxon

seeks to have offset.

Exxon's argument is based on the general principle that an

award of lost earnings makes the wrongfully discharged employee

whole and that to add pension benefits would give the employee a

windfall. Ellenwood counters with his own windfall argument:

subtracting the expected benefits from the damages award treats

the employer who breaches an employment contract more charitably

than one who has observed one faithfully. Both parties cite

caselaw to support their claims.

In fact, however, we conclude that the record made in this

case, rather than general principles, dictates the result. The

relevant facts are contained in a letter from an Exxon official

in response to a request from Ellenwood's counsel to provide

"[t]he 1990 percentages of payroll for the various benefits

provided to employees." Brief of Plaintiffs-Appellees at

Addendum 18. The letter, which is not mentioned in Exxon's

brief, itemized the percentages of payroll attributable to life

insurance, medical and dental insurance, Medicare, a thrift plan,

long term disability insurance, workers' compensation, and "all

other." These items totalled 20.8% But included in the listing,

indeed heading the list, was "Annuity" and its percentage,

"(2.7%)". In other words, this percentage was deducted from the

-40-

total of the above listed items, making the bottom line total

percentage for fringe benefits 18.1%.

The effect of this listing was to indicate to Ellenwood's

economic expert on damages that he should add to his computation

of lost earnings 18.1% of those earnings to reflect compensation

in the form of fringe benefits. Exxon did not add into the

benefits total the 2.7% annuity item, which would amount to an

annual payment of approximately $2,300. Indeed, the letter

subtracted the 2.7% from the remaining total of benefits, thereby

reducing by a substantial amount the present discounted value of

Ellenwood's fringe benefits.

Had there been no breach of the employment contract, the

$2,300 yearly contribution apparently would have bought an

annuity that, upon Ellenwood's retirement at age 65, would have

yielded annual payments in an amount much larger than the present

$20,000 amount. We look upon this amount as having been bought

by prior Exxon contributions and earned by Ellenwood as part of

Exxon's compensation package. To allow Exxon a further deduction

for the income stream purchased by the annual $2,300 payment

would seem to be, as Ellenwood argues, to allow a double credit.

This, at least, is how we read the testimony of plaintiff's

economist, Dr. McCausland, who had asked for the percentages

applicable to fringe benefits. He testified that

the fringe benefit [sic] had to be put into present
value terms . . . , it's how many dollars do we have to
give him today so he'll have that amount of money
available to him in each year to pay for the same
fringe benefits.

-41-

And I based it on their fringe benefit package . .
. . And what I did, I took 18.1 percent of the present
value of lost earnings, and that works out to be
$294,528.79.

Tr. Vol. V, at 111. On cross examination Exxon's counsel asked,

"Now you were also aware that Mr. Ellenwood is receiving almost

$20,000 a year in pension benefits currently from Exxon Shipping

Company?" To this, Ellenwood's counsel objected, saying, "that's

his money, and it is not properly considered to be mitigation."

Whereupon Exxon's counsel withdrew the question. Id. at 121-122.

On this record the district court ruled that it was "the

burden of proof of the defendant to come forward and show that

these are benefits being received that should be subtracted from

the amounts that plaintiff would otherwise . . . receive" and

that "the state of the record doesn't permit that determination."

Tr. Vol. XI, at 35. We agree. Indeed, it seems to us that the

record is not merely insufficient to support a basis for offset,

but points affirmatively to an already accomplished deduction.

VII. Conclusion

The following is a brief summary of our major holdings:

(1) we reverse the district court's ruling that state

statutes prohibiting discrimination against the handicapped are

preempted by the Rehabilitation Act of 1973 and maritime law, as

well as its ruling that plaintiff's claim of violation of state

public policy is similarly preempted, and the case therefore is

remanded for further proceedings on such claims;

-42-

(2) we affirm the district court's ruling that Ellenwood's

state contract and promissory estoppel claims are not preempted

by either the Rehabilitation Act or maritime law;

(3) we decline to address the Ellenwoods' claim that the

district court improperly granted Exxon's request for judgment as

a matter of law on their claims for negligent infliction of

emotional distress, concluding that these claims were not

adequately developed;

(4) we affirm the district court's refusal to submit the

issue of punitive damages to the jury;

(5) we find that Exxon failed to preserve its challenge to

the district court's instruction imposing upon it the burden of

demonstrating that Ellenwood would have been removed from his

chief engineer's position in late 1989 for bona fide reasons

independent of his participation in an alcohol rehabilitation

program;

(6) and we affirm the district court's decision to exclude

from the jury's damages calculation Ellenwood's sea service

retirement benefits.26

The judgment of the district court is therefore affirmed in

part, reversed in part, and remanded for further proceedings

consistent with this opinion. No costs.

26 We have reviewed the district court's rulings on
Ellenwood's privacy claims, and find no error.

-43-

APPENDIX

The following is the full text of Exxon's proposed additional

instruction on damages for breach of contract or promise, as

discussed supra at page 36.

As you know, Mr. Ellenwood ceased receiving a salary
from Exxon Shipping on January 15, 1991. If you find
as Exxon Shipping claims that Mr. Ellenwood would have
been terminated prior to that time in the fall of 1989
because of his low performance ranking compared to
other chief engineers when Exxon Shipping's oceangoing
fleet was downsized, then no damages should be awarded
even if you find that Exxon Shipping breached a
contract with Mr. Ellenwood.

Under such circumstances, the conduct of Exxon
Shipping complained of here was not the proximate cause
of any loss Mr. Ellenwood suffered. If on the other
hand you find that Mr. Ellenwood would not have been
terminated when the fleet was downsized, you may
continue to consider damages.

During this case a number of witnesses have
testified regarding Exxon Shipping's performance
evaluation and ranking system. This case is not about
whether you agree with or like Exxon Shipping's
performance evaluation or ranking procedures, or
whether you agree with or like Exxon Shipping's
employment practices. As I previously instructed you,
you may not substitute your judgment for the company's.

I therefore instruct you that your views
concerning whether Exxon Shipping's ranking system was
well administered cannot be considered by you in
rendering your decision in this case. You may not
consider whether in your opinion the evaluations or the
rankings are appropriate or were done in a manner you
agree with.

The sole question you are to consider is whether
Exxon Shipping maintained its employee ranking list in
good faith. In deciding the question, plaintiffs have
the burden of proof. By that I mean you must decide
whether the plaintiffs have proven by a preponderance
of the evidence that Exxon Shipping manipulated or

-44-

otherwise misused its ranking procedure in bad faith to
cause Mr. Ellenwood to be ranked lower on the ranking
list of chief engineers than he otherwise would have
been.

In essence, did Exxon Shipping make its
evaluations of Mr. Ellenwood in bad faith with an
intent to injure him in order to improve Exxon
Shipping's defense in this case.

If you conclude that plaintiffs have not proven by
a preponderance of the evidence that Exxon Shipping
acted in bad faith in establishing its ranking list in
1989, then you must find that Mr. Ellenwood has
suffered no damages under either of his contract
claims.

-45-